UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

DEBBIE ALMONTASER,

                           Plaintiff,

      -against-

NEW YORK CITY DEPARTMENT OF EDUCATION;
JOEL KLEIN, individually and in his official capacity as
Chancellor of the New York City Department of Education;
ROSEMARY STUART, individually and in her official
capacity as Community Superintendent of District 15 and
Hiring Manager; CITY OF NEW YORK; MICHAEL
BLOOMBERG, individually and in his official capacity as
Mayor of the City of New York; DENNIS WALCOTT,
individually and in his official capacity as Deputy Mayor
for Education and Community Development,

                           Defendants.

------------------------------------------------------------------------x

**CV 07-**

**ECF CASE**

**COMPLAINT WITH
JURY DEMAND**

07 CIV 10444 (SHS)(FM)

      Plaintiff Debbie Almontaser, as and for her complaint, by her attorneys, Alan Levine and

Beldock Levine & Hoffman LLP, alleges as follows:

### PRELIMINARY STATEMENT

    1.     This action arises from defendants' acts in violation of plaintiff's rights under the

First and Fourteenth Amendments to the United States Constitution. Plaintiff was a moving force

behind the establishment of the Khalil Gibran International Academy ("KGIA), the first public

Arabic dual language school in New York City. By their actions, defendants forced plaintiff to

resign from her position as interim acting principal of KGIA and are now denying plaintiff the

opportunity to become the permanent principal of KGIA because of her protected speech. This

action seeks injunctive and declaratory relief and compensatory and punitive damages to redress

deprivation of and to secure protection of plaintiff's constitutional rights under the First and

Fourteenth Amendments pursuant to 42 U.S.C. §1983, as well as the Constitution of the State of

New York.

## JURISDICTION AND VENUE

2.      The jurisdiction of the Court is invoked pursuant to 42 U.S.C. §1983 and is

founded on Title 28 U.S.C. §1343(3) and (4). This Court has supplemental jurisdiction over all

state constitutional and state law claims pursuant to 28 U.S.C. §1367(a).

3.      The deprivations of rights alleged below were committed within the district of the

United States District Court, Southern District of New York.

## PARTIES

4.      At all times relevant hereto, plaintiff Debbie Almontaser was and still is a resident

of the State of New York, County of Kings.

5.      Almontaser is a respected educator who was selected to be the project manager and

then the interim acting principal of the Khalil Gibran International Academy, the first public

Arabic dual language school in New York City.  Plaintiff is and has been at all times relevant

hereto an employee of the New York City Department of Education

6.      Defendant New York City Department of Education ("DOE") is a department of

the City of New York.

7.      Defendant Joel Klein is the Chancellor of the Department of Education.

8.      Defendant Rosemary Stuart is the Community Superintendent of District 15 and

the Hiring Manager for the position of principal of the Khalil Gibran International Academy.

2

("KGIA").

9.     Defendant City of New York is a municipal corporation within the State of New York.

10.    Defendant Michael Bloomberg is the Mayor of the City of New York.

11.    Defendant Dennis Walcott is the Deputy Mayor for Education and Community Development of the City of New York.

12.    Upon information and belief, all individual defendants were and are citizens of the United States and residents of the State of New York.

13.    All individual defendants are sued individually and in their official capacities.

14.    At all times relevant hereto, defendants and each of them were acting under color of state law.

15.    At all times relevant hereto each of the individual defendants was and still is an officer, agent or employee of the City of New York.

16.    At all times relevant hereto, all individual defendants were acting in their capacities as officers, agents or employees of the City of New York and within the scope of their employment.

17.    Defendants DOE and City of New York were and are public employers located in New York, Brook, New York.

18.    The individual defendants possess final policymaking authority to establish municipal policy with respect to the actions at issue.

STATEMENT OF FACTS

19.    Plaintiff's adult life has been devoted to two principal undertakings, the education

3

of children and the promotion of understanding and tolerance between persons of diverse ethnic, racial, and religious backgrounds. When she was asked by New Visions for Public Schools, an educational reform organization that assists the Department of Education in establishing new schools, to participate in the development of the Khalil Gibran International Academy, and then to become its founding principal, she saw that as an opportunity to merge these two undertakings: to educate children through a curriculum that was dedicated to multi-cultural understanding.

**Work with Diverse Communities**

20.     Plaintiff's work in promoting understanding between diverse communities was well known to New Visions and the DOE upon the creation of KGIA. Indeed, that work was a principal reason that she was identified as the person to lead KGIA.

21.     Most of this work began after the attacks of 9/11, when tensions between New York's ethnic and religious communities deteriorated rapidly. Soon thereafter she worked with Community School District 15 to develop a Multicultural Task Force for school staff and parents to promote school harmony.

22.     In January 2002, she became the Community Coordinator for the Christian Children's Fund, which worked collaboratively with local Muslim, Christian, and Jewish resource centers, as well as with school personnel and neighborhood associations, in promoting multicultural awareness and understanding. She continued that work as Cultural Diversity Coordinator for High Schools from September 2002 to August 2003.

23.     In May 2003, she became Project Consultant for the Mosaic Youth Project, which was an anti-bias pilot project that incorporated diversity and anti-bias training, nonviolence,

4

conflict resolution, and leadership skill-building with theater arts for social change. Its goal was to provide youth with the skills to negotiate conflict in the post-9/11 world.

24.      In 2001, she became a founding board member of The Dialogue Project, which seeks to build trust, compassion, and understanding around issues relating to the conflict in the Middle East.

25.      She is a member of the Brooklyn President's New Diversity Task Force, which attempts to build bridges of understanding among Brooklyn's diverse communities. It does so through participation in cultural events and educational forums organized by community leaders and clergy.

26.      She is a member of the advisory board of the Same Difference Interfaith Alliance, a coalition of Jewish, Muslim, and Christian groups who came together in response to the events of September 11. Using various forms of artistic expression, the Alliance seeks to heal racial, cultural, and religious tensions throughout America.

27.      She is an advisor to the Interfaith Center of New York on cultural and religious issues pertaining to the Arab and Muslim communities. She has facilitated workshops on diversity and spoken on panels to further its goal of promoting respect and understanding among various religious groups in New York.

28.      She was a co-founder of Brooklyn Bridges, which provided Arab and Muslim communities with escorts in the weeks following 9/11. It has continued to organize cross-cultural events at Brooklyn churches and synagogues.

29.      She joined with a group of New York City educators to form the September 11th Curriculum Project, which sought to address the issues and tensions that arose among

5

schoolchildren after the 9/11 attacks. The project conducted a series of day-long conferences to develop relevant curriculum and sent specialists to schools that requested them.

30.     She is a founding board member of We Are All Brooklyn, which works on issues that divide Brooklyn's diverse ethnic and religious communities.

31.     She has contributed chapters for two books on her inter-ethnic and community and education work, The Day Our World Changed: Children's Art of 9/11 for New York University's Child Care Center, and Forever After: New York City Teachers on 9/11 (Teachers College Press).

32.     She has received a number of awards in recognition of this work, including a Peace Builder Award from the Brooklyn Ethical Society, an Educator/Bridge Builder Award from the Brooklyn Borough President, a Multi-Cultural Educator/Peace Builder Award from Brooklyn Parents for Peace, and an Arab Heritage Recognition Award from the Mayor of the City of New York.

**The Founding of KGIA**

33.     Plaintiff was first contacted about opening a new school by Adam Rubin from New Visions, who was referred to her by the DOE. They initially talked about a school that would teach both Hebrew and Arabic, but linguists with whom they consulted suggested that it would be difficult to teach two such difficult languages. Eventually, the decision was made to create a school that would provide a rigorous regents-based curriculum with Arabic language and cultural studies, and that would equip students for work in such areas as international affairs, diplomacy, and cross-cultural understanding. As with the more than 60 other dual language programs in the city, KGIA was created to foster multilingual and multicultural education. It was also joining

6

many New York City public schools that use theme-based approaches to inform and enrich curriculum across subject areas.

34.    On February 12, 2007 the Department of Education announced the establishment of KGIA and Almontaser was named Project Director, the title that is given by the DOE to persons who lead the development of a new school.  Within two days, and continuing almost daily until she was forced to resign, newspapers and internet bloggers began attacking the school as an Islamist religious school.  Local papers ran headlines such as  "Holy war! Slope Parents Protest Arabic School Plan," "Arabic School Idea Is a Monstrosity,"  and "A Madrassa Grows in Brooklyn." "Madrassa" is an Arab word for "school" that is used negatively in English to connote an Islamic religious school. For months, the New York Sun ran negative articles about KGIA.

35.    Leading the attack was the "Stop the Madrassa Coalition," which conducted a ferocious smear campaign against the school.  Members of the coalition stalked plaintiff wherever she went and verbally assaulted her with vicious anti-Arab and anti-Muslim comments.  They suggested that, as an observant Muslim, she was disqualified from leading KGIA, even though the school was designed to be rigorously secular, and its namesake, Khalil Gibran, was a Lebanese Christian.  To stir up anti-Arab prejudice, they referred to plaintiff by her Arabic name, a name that she does not use professionally.  Her critics even created a YouTube clip depicting her as a radical Islamist.

36.    Despite the attacks on KGIA, planning for the school continued.  Plaintiff supervised the development of curriculum, hired and trained staff, recruited students, and, in general, prepared the school for its September opening.  On July 2, Almontaser was made the

7

interim acting principal of the school, which is the title that leaders of new schools are given until a permanent principal is selected.

## Events Leading to Forced Resignation

37.     In early August, the Stop the Madrassa Coalition tried to connect plaintiff to t-shirts made by a youth organization called Arab Women in the Arts and Media, which used space rented by an organization called SABA, on whose board plaintiff sits. The t-shirts said "Intifada NYC." Almontaser had never heard of the t-shirts until the issue about them was raised in early August. They had no connection to KGIA.

38.     The t-shirts came to the attention of Channel 7, WABC, and, on Friday, August 3, Lila Corn of WABC emailed Melody Meyer of the DOE press office for comment. Ms. Meyer sent Almontaser an email, and asked her what she knew about the t-shirts. Significantly, she asked if Almontaser could "clarify the actual meaning of the shirts so that she can explain rationally what they mean to this producer. . ." The emails from Ms. Corn and Ms. Meyer are attached to the Complaint as Exhibit A. Later Ms. Meyer advised Almontaser that WABC decided not to pursue the story.

39.     However, Chuck Bennett of the New York Post called the DOE and asked to interview Ms. Almontaser. On Sunday, August 5, at 12:32 he sent Ms. Meyer an email with a list of questions about the t-shirts. At 1:59 that day, Ms. Meyer sent Bennett's questions to plaintiff and said that David Cantor, her superior in the press office, was having a conversation with Bennett at that moment "about the fact that he's buying into the extreme view that intifada is terrorism, which just isn't accurate." Exhibit B to the Complaint.

8

40.    That afternoon plaintiff drafted responses to Bennett's questions. Exhibit C to the Complaint. Although Cantor and plaintiff agreed that the issue of the t-shirts did not require that she submit to an interview, Bennett kept pressing for an interview. Because plaintiff knew nothing about the t-shirts, and they had nothing to do with KGIA, she saw no reason to speak to him, especially given the hostile tone of the written questions, and his obvious desire to discredit KGIA.

41.    Almontaser had further discussions with Cantor during the afternoon, who said that it would be best to do the interview.

42.    The interview took place later that day, Sunday, August 5, by telephone. During the interview, Bennett asked about the Arabic origin of the word "intifada." Almontaser told him that the root word from which the word intifada originates means "shake off." She also said that the word has different meanings for different people, but certainly for many, given its association with the Palestinian/Israeli conflict, it implied violence. In response to a further question about AWAAM as a possible terrorist training group, she expressed the belief that the teen-age girls of AWAAM did not mean to promote a "Gaza-style uprising" in New York City.

43.    Melody Meyer of the DOE's press office was on the telephone call. She called Almontaser after the call was over and said, "Good job. I think it went well. Hopefully it will be okay tomorrow."

44.    The story in the Post ran the next day, Monday, August 6, under the headline "City Principal is 'Revolting.'" After saying that "Almontaser downplayed the significance of the T-shirts," the story quoted her as saying:

9

> The word [intifada] basically means 'shaking off.' That is the root
> word if you look it up in Arabic.
> I understand it is developing a negative connotation due to the
> uprising in the Palestinian-Israeli areas. I don't believe the intention
> is to have any of that kind of [violence] in New York City.
> I think it's pretty much an opportunity for girls to express that they
> are part of New York City society . . . and shaking off oppression.

A picture caption reads: "The pro-violence shirt is being defended by Principal Debbie
Almontaser (above)." The Post story is attached to the Complaint as Exhibit D.

45.     Although the Post story distorted the meaning of plaintiff's words, it accurately

reflected her view that she does not condone violence (although it was interpreted otherwise).

That should have been the end of the matter. DOE officials should have pointed out that

Almontaser had devoted her entire adult life to the peaceful resolution of conflict and to building

bridges between ethnic and religious communities. Since neither she nor KGIA had any

connection to the t-shirts, DOE should simply have said the t-shirts were a non-story so far as she

and KGIA were concerned.

46.     Instead of responding with a statement on behalf of the DOE about Almontaser's

lifelong commitment to peaceful resolution of conflict, Cantor suggested that she solicit "some of

her former colleagues – particularly those from the Jewish Community – to write letters to the

editor of the Post, defending Ms. Almontaser. Something saying that the Post article implies that

Debbie Almontaser condones violence, when her entire career has been about finding ways to

resolve conflict without violence." Exhibit E to the Complaint. She immediately sent emails to

various Jewish members of KGIA's advisory board and some Jewish friends. But Cantor said

nothing like that for the DOE.

47.    Instead, Cantor sent her an email on Monday chastising her for defending or explaining the t-shirts. Exhibit F to the Complaint. However, as was clear from the article, she had explained the meaning of the word "intifada," but had not defended the t-shirts. In fact, she did for Chuck Bennett what she had done when Meyer asked her to explain the t-shirts for Lisa Corn of WABC.

48.    Later on Monday afternoon, Cantor called and said that he had been talking to Joel Klein, the Chancellor, and together they had drafted an "apology" for Almontaser. She protested that she had nothing to apologize for, but he insisted, telling her that the people who have been supporting her and the school "are sitting on the fence." The clear implication was that her job and the school were at stake if she refused. The statement they had drafted made her seem foolish, and she proposed some changes. But Cantor rejected those, and the original version of the apology was issued later on Monday.

49.    Nevertheless, the Post continued its attacks on plaintiff, joined over the next few days by the New York Sun. Both papers published news stories and letters from Jewish leaders who interpreted Almontaser's remarks as endorsing violence against Israel.

50.    On Thursday morning, August 9, Almontaser received a call from Gloria Rakovic, the Director of New School Development at New Visions, with whom she had worked over the prior several months. She told her that Bob Hughes, the President of New Visions, wanted to see her. She met Rakovic and Hughes at 1 p.m. at the New Visions offices. Rakovic told her that a "sensitive" school such as KGIA required "quick thinking," and that she lacked that skill. Hughes told her that the school could not continue with her as its leader and that she should resign if she

11

wanted to see the school open and/or continue.  Plaintiff responded that she would like to speak with the Chancellor.

51.    Instead, at the suggestion of Hughes, Almontaser called Dennis Walcott, the Deputy Mayor for Education and Community Development.  Later that day, they met (although Walcott made it clear he did not want to be seen publicly with her).  Walcott also made clear that the Mayor wanted her resignation, and told her that she would be given a position as an assistant principal.  When she said that an assistant principal position would be a demotion, and would imply an admission of wrongdoing, he said he would check with DOE about some other position. When they spoke again later that afternoon, he said that the DOE could not guarantee that she would get a particular job, but he gave her his word that he would help her find a satisfactory position.  He added that the Mayor wanted her resignation by 8 a.m. the next morning so that he could announce it on his radio show that morning.

52.    That Thursday evening plaintiff drafted a resignation letter.  Exhibit G to the Complaint. She faxed it to the DOE the next morning.

53.    Since leaving KGIA, plaintiff has been assigned at DOE headquarters to the Office of School and Youth Development.

**Application to Become Principal of KGIA**

54.    The DOE has opened a large number of new schools in the past few years.  The person who heads the school when it opens has the title of interim acting principal, which was plaintiff's title at KGIA.  In the weeks after a new school opens, the DOE posts the position of principal of the school on the DOE website and solicits applications for that position.  The selection process then proceeds in accordance with the Chancellor's C-30 Regulation.

12

55.    In early October, plaintiff learned that the position of principal at KGIA had been posted. She would have been applying for that position had she continued as interim acting principal and began planning to submit her application. The closing date for applying was Tuesday, October 16.

56.    On October 5, 2007 plaintiff met with Garth Harries, who, as the head of the DOE's Division of New Schools, had worked closely with plaintiff and New Visions during the months that KGIA was being developed. In the weeks since she had left KGIA, Harries and she had spoken on a few occasions about other career opportunities. None of them were very appealing. In KGIA, she had developed a school with a vision that incorporated all of her lifelong passions. Harries made it clear that the DOE would not place her in, or allow her to develop, a school that was likely to attract attention. In other words, the DOE would not allow her to run the same kind of creative school as KGIA.

57.    Plaintiff told Harries at that meeting that she intended to apply for the KGIA principal's position. He said that he had learned from others that she was considering that option and he had discussed it with the DOE's "executive leadership." He said that they would not support her return to the school. He said that, since she had exhibited what he called "media naivete," they would only support her running a school that was "less visible." He told her that if she did apply for the KGIA principal, it would be the "community superintendent's decision," and that the community superintendent "has a boss who would not support your appointment." The community superintendent's "boss" is the Chancellor.

58.    On Saturday, October 13, plaintiff sat down at her computer to fill out the DOE's on-line application for the KGIA position. It was no longer on the DOE website. She then called

her lawyer and, on Monday, October 15, the posting reappeared on the DOE website. She filled out the application and, on October 16, she was sent an acknowledgment of its receipt.

59.     Plaintiff spoke out publicly for the first time on October 16 about the circumstances under which she had left KGIA. She also announced that she had submitted her application to become principal.  On October 18, the New York Times published a story under the headline "Principal Won't Be Rehired."  According to the story, "David Cantor, a spokesman for Schools Chancellor Joel I. Klein, said yesterday that it was clear Ms. Almontaser. . . would not be placed as principal at the school."  Exhibit H.

60.     The first stage of the C-30 process is the review of all applications for the position to the "Hiring Manager."  For the KGIA position, the Hiring Manager is the Community Superintendent of District 15, Rosemary Stuart.  It is her responsibility to select three to five applicants for interviews by the Level I Committee, which is a school-based committee that includes parents, staff, and union representatives.  Those interviews are scheduled for Tuesday, November 20.

61.     On Friday, November 16, plaintiff received a "rejection" message advising her that she was not one of those selected for an interview by the Level I Committee.

62.     Almontaser is applying to be the principal of KGIA because, as the person who envisioned the school, who helped develop the curriculum, hired the staff, and recruited students, in short, the person most responsible for creating KGIA, she believes she is the most qualified person to implement its vision.

63.     On information and belief, Almontaser has been excluded from the C-30 interview process, not because of her lack of qualifications, but because of her protected speech as reported

14

in the New York Post last August and the capitulation of DOE and City officials to the disgraceful and discriminatory attacks upon her and the school.

64.     Defendants' forced resignation of plaintiff was violative of plaintiff's constitutional rights.

65.     Upon information and belief, the process which resulted in the rejection of plaintiff's application for the KGIA principal position was infected with improper retaliatory motive.

66.     In addition, it was unfair, biased, lacking in due process, inadequate and otherwise flawed and improper.

67.     Defendants have acted in bad faith, with malice, with the intent to injure plaintiff, and with reckless disregard of plaintiff's career, reputation and rights.

68.     Defendants' acts as described herein constitute, inter alia, adverse employment actions.

69.     Upon information and belief, it is defendants' intention, by rejecting plaintiff's application for the KGIA principal position to bar plaintiff from a principal position in any special or innovative DOE school.

70.     As a result of defendants' acts, plaintiff will suffer economic loss, as well as damage to her career and reputation, mental and physical pain and suffering, emotional distress, embarrassment and substantial dislocation in her personal and professional life.

71.     Defendants have acted with deliberate indifference to plaintiff's constitutional rights.

72.     Plaintiff has no adequate remedy at law.

## COUNT I

### (42 U.S.C. § 1983; First Amendment)

73.    Plaintiff repeats and realleges each and every allegation made in the foregoing paragraphs as if fully set forth herein.

74.    As described above, plaintiff engaged in speech which was reported in the New York Post.

75.    Plaintiff's speech constituted speech on a matter of public concern.

76.    Plaintiff's speech constituted speech protected by the First Amendment.

77.    Plaintiff acted in good faith in engaging in such protected speech.

78.    Defendants urged plaintiff to engage in such speech.

79.    Defendants knew or should have known that plaintiff's speech was and is protected.

80.    Defendants' acts as described above, including without limitation defendants' forcing plaintiff's resignation from the interim acting principal position at KGIA, constitute adverse and punitive actions with respect to the terms and conditions of plaintiff's employment and plaintiff's ability to engage in and practice her profession as an educator.

81.    Plaintiff's speech was the substantial and motivating factor in the adverse actions taken by defendants against plaintiff.

82.    By their acts as described above, defendants have retaliated against plaintiff in violation of plaintiff's rights under the First Amendment of the United States Constitution and Article 1, Section 8 of the Constitution of the State of New York for engaging in protected speech on a matter of public concern.

83.    Defendants acted under color of state law and in bad faith.

84.    As a result of defendants' acts, plaintiff has been and will be damaged.

## COUNT II

### (42 U.S.C. § 1983; First Amendment)

85.    Plaintiff repeats and realleges each and every allegation made in the foregoing paragraphs as if fully set forth herein.

86.    Defendants' acts as described above, including without limitation denying plaintiff the opportunity to be considered for and in fact rejecting plaintiff's application for the KGIA permanent principal position, constitute adverse and punitive actions with respect to the terms and conditions of plaintiff's employment and plaintiff's ability to engage in and practice her profession as an educator.

87.    Plaintiff's speech was the substantial and motivating factor in the adverse actions taken by defendants against plaintiff.

88.    By their acts as described above, defendants have retaliated against plaintiff in violation of plaintiff's rights under the First Amendment of the United States Constitution and Article 1, Section 8 of the Constitution of the State of New York for engaging in protected speech on a matter of public concern.

89.    Defendants acted under color of state law and in bad faith.

90.    As a result of defendants' acts, plaintiff has been and will be damaged.

## COUNT III

### (42 U.S.C. § 1983; Due Process)

91.    Plaintiff repeats and realleges each and every allegation made in foregoing paragraphs as if fully set forth herein.

92.    Plaintiff's position as interim acting principal constituted a property and liberty interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

93.    Defendants' acts constituted a forced resignation and a constructive discharge.

94.    Plaintiff's ability to practice her profession as an educator without the stigma of a forced resignation or constructive discharge on her record constitutes a property and/or liberty interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

95.    Defendants by their acts described above have deprived plaintiff of protected property and liberty interests in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 1, Section 6 of the Constitution of the State of New York.

96.    In their acts as described above defendants acted in bad faith.

97.    Defendants acted under color of state law.

98.    As a result of defendants' acts, plaintiff has been and will be damaged.


## COUNT VI

### (Breach of Contract)

99.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

100.    Upon information and belief, defendants have interfered with plaintiff's contractual relationship and agreements with DOE and have breached their promise to plaintiff to find her a comparable position.

## COUNT VIII

### (Infliction of Emotional Distress)

101.    Plaintiff repeats and realleges each and every allegation made in the foregoing paragraphs as if fully set forth herein.

102.    Defendants' acts were under all the attendant circumstances described above, punitive, extreme and outrageous.

18

103.    In forcing plaintiff's resignation, denying her application and jeopardizing plaintiff's professional and personal well-being, defendants intentionally and/or recklessly caused severe emotional distress to plaintiff.

104.    As a result of defendants' acts, plaintiff has been and will be damaged.

WHEREFORE, plaintiff respectfully requests that this Court:

(a)    issue a declaratory judgment that defendants' acts, policies, practices and procedures complained of herein violated plaintiff's rights under the First and Fourteenth Amendments of the United States Constitution and the New York Constitution;

(b)    issue a preliminary and permanent injunction enjoining and restraining defendants from proceeding pursuant to Chancellor's Regulation C-30 or otherwise to select, assign or appoint a principal at the Khalil Gibran International Academy until plaintiff is afforded a full and fair opportunity to be reviewed and considered for the position of KGIA principal according to principles of merit and fitness, as provided in Chancellor's Regulation C-30, and including final consideration by a disinterested person;

(c)    award plaintiff damages for injury to her career and reputation, pain, suffering and emotional distress, in an amount to be determined at trial;

(d)    award plaintiff punitive damages; and

(e)    award plaintiff's attorneys fees pursuant to 42 U.S.C. §1988, together with costs and disbursements;

(f)    grant such additional relief as the Court deems just and proper.

### JURY DEMAND

### PLAINTIFF DEMANDS TRIAL BY JURY

Dated:  New York, New York
        November 19, 2007

ALAN LEVINE (AL 5297)
99 Hudson Street
New York, New York 10013
(212) 739-7506


BELDOCK LEVINE & HOFFMAN LLP

By:_____
    Cynthia Rollings (CR 6469)

99 Park Avenue
New York, New York 10016
(212) 490-0400

Attorneys for Plaintiffs

20

Exhibit A

----- Original Message -----
From: Meyer Melody
To: Almontaser Debbie (15K592); njdsa719@aol.com <njdsa719@aol.com>
Sent: Fri Aug 03 13:49:54 2007
Subject: FW: Arabic school - response?
Debbie,

Channel 7 has stayed out of the KGIA story so far, but I received the email below today. Are you involved with awaam.org? Did you know about these t-shirts? If so, can you clarify the actual meaning of the shirts so that I can explain rationally what they mean to this producer? As an FYI, I don't think she wants to do a story about this, and she's relatively reasonable.

Thanks,
Melody

From: Corn, Lila [mailto:Lila.Corn@abc.com <mailto:Lila.Corn@abc.com>]
Sent: Friday, August 03, 2007 1:06 PM
To: Meyer Melody
Subject: Arabic school - response?

As you well know, there's opposition to the new Khalil Gibran International Academy.
Someone involved in that sent us what is posted below.

I've been asked to check this out, so I'm looking for a response to the question of whether there is a relationship between the principal of the new school and these T-shirts.
I would like to speak with Ms. Almontaser.

Thanks.



Exhibit B

REDACTED

-----Original Message-----
From: Meyer Melody <MMeyer@schools.nyc.gov>
To: njdsa719@aol.com; Almontaser Debbie (15K592)
<DAlmont@schools.nyc.gov>
Sent: Sun, 5 Aug 2007 1:59 pm
Subject: Fw: Khalil


Debbie,

Please see below from chuck bennett at the post. David is having a
conversation
with him right now about the fact that he's buying into the extreme
view that
intifada is synonomous with terrorism, which just isn't accurate.

David wanted me to ask you how you would reply to the questions below.

We see this attack as personal and reliant on tenuous connections that, with
regards to the school, are overshadowed by the oversight of mayor bloomberg and
chancellor klein. I'm asking for your input to help inform the response that we
will likely have to send to the post (assuming the story doesn't go away).

Chuck is asking for a response this afternoon by 3 or 4. Please get back to me
asap. I'm sorry to interrupt your weekend with this.

Melody


----------------------------
Sent from my BlackBerry Wireless Handheld



Exhibit C

REDACTED

----- Original Message -----
From: Bennett, Charles <cbennett@nypost.com>
To: Meyer Melody
Sent: Sun Aug 05 12:32:39 2007
Subject: Khalil

Please find image of Intifada NYC T-shirt attached. Please note teh AWAAM url on

the t-shirt. Please find Khalil Gibran exec summary attached as well.

1) Is it appropriate that Almontaser be associated with a group that sells
Intifada NYC t-shirts? Why or why not? The group AWAAM shares office space with
Saba Yemeni Association. Almontaser is board member of Saba.

Almontaser is not associated with AWAAM. She is on the board of Saba giving back
to the

communities that area.  She is no different than other principals in the PS
system. Saba

has given AWAAM the opportunity to run it's girl's youth empowerment program

free of charge since it is a non profit org funded by recognized
foundations.

2) Is it appropriate for the academy to orient itself towards the children of

Arab immigrants?

KGIA is open to all students of the NYC who are interested in learning arabic
and

becoming experts on that part of the world for international careers and gov.
jobs.

3) Is it appropriate for "community members come daily to converse with students

so as to strengthen their fluency." See page 18 of Exec Summary.

All community members volunteering for the school's conversational table talk
will be

screened by Learning Leaders, a non profit org facilitating this process of
public schools.

There will be conversation guidelines as well as schedule that volunteers will
adhere to.

4) Is it appropriate for students to organize charity drives for Middle Eastern,

South Asian based charities? See page 18.

If such a drive took under way, it would be coordinated with US based charities

assisting in any region.

5) Is it appropriate for the school's board of advisers to consists almost
solely of religious figures?

School's advisory group called the Friends of KGIA is still in formation. It is
one that is diverse

reflecting the diversity of the school populaiton.

Chuck Bennett
Reporter
New York Post

(212) 930-8601

---

This message and its attachments may contain legally privileged and/or confidential information. If you are not the intended recipient (or responsible
for delivery of the message to the intended recipient), you are hereby notified
that you have received this transmission in error; any review, dissemination,
distribution or copying of this transmission is strictly prohibited. If you have

received this communication in error, please notify us immediately by reply or
by telephone (call us at 212-930-8000) and immediately delete this message and
all its attachments. Any content of this message and its attachments that does
not relate to the official business of NYP Holdings, Inc. must be taken not to
have been sent or endorsed by any of them. No warranty is made that the e-mail
or attachment(s) are f r e e from computer v i r u s or other defect.

[Image Removed]
<http://webmail.aol.com/29047/aol/en-us/Mail/get-attachment.aspx?uid=1.17103737&folder=New+Mail&partId=3>

---

AOL now offers free email to everyone. Find out more about what's free from AOL
at AOL.com <http://www.aol.com?ncid=AOLAOF00020000000437> .

<hr size=2 width="100%" align=center>

Email and AIM finally together. You've gotta check out free AOL Mail!

Exhibit D



WIN A WEEKLY GRAND PRIZE ON NYPOST.COM/CARS!

NYC Weather
42 ° OVERCAST

Sunday, November 18, 2007
Last Update: 52:50 PM EST

CARS
JOBS
REAL ESTATE
DATING

powered by YAHOO! SEARCH
Recent ▼ GO

NEWS

News Home Columnists Local National International Weird But True NYPD Blotter Traffic & Transit Lottery

CONTINENTAL.COM.
THE DEFINITION OF
EASY GOING.
Make continental.com
your one-stop
travel center.

Continental Airlines

SEARCH FOR FLIGHTS
From:

To:

Depart:
MM/DD/YYYY
Return:
MM/DD/YYYY
GO

continental.com




# CITY PRINCIPAL IS 'REVOLTING'

### TIED TO 'INTIFADA NYC' SHIRTS

By CHUCK BENNETT and JANA WINTER

August 6, 2007 -- Activists with ties to the principal of the city's controversial new Arabic-themed school are hawking T-shirts that glorify Palestinian terror, The Post has learned.

The inflammatory tees boldly declare "Intifada NYC" - apparently a call for a Gaza-style uprising in the Big Apple.

The organization selling the shirts, Arab Women Active in Art and Media, shares office space on Brooklyn's Third Avenue with the Saba Association of American Yemenis.

Dhabah "Debbie" Almontaser, principal of the Khalil Gibran International Academy - which is scheduled to open in Brooklyn next month - is a board member and spokeswoman for Saba.




FUROR: The pro-violence shirt is being defended by Principal Debbie Almontaser (above)

PREVIOUS ◄ ► ► NEXT

Members of AWAAM refused to comment.

But Almontaser downplayed the significance of the T-shirts.

🖨 PRINT
✉ EMAIL TO A FRIEND
DIGG IT
REDDIT
PERMALINK

"The word [intifada] basically means 'shaking off.' That is the root word if you look it up in Arabic," she said.

"I understand it is developing a negative connotation due to the uprising in the Palestinian-Israeli areas. I don't believe the intention is to have any of that kind of [violence] in New York City.

"I think it's pretty much an opportunity for girls to express that they are part of New York City society . . . and shaking off oppression."

AWAAM's co-founders, Rama Kased and Mona Eldahry, are also active in the more militant pro-Palestinian group, al-Awda, whose main U.S. office is in California.

That organization, according to the Anti-Defamation League, is an active supporter of the terrorist groups Hezbollah and Hamas.

"The T-shirt is a reflection of a movement that increasingly lauds violence against Israelis instead of rejecting it. That is disturbing," said Oren Segal, a spokesman for the ADL.

Almontaser, a community activist and Muslim, has said the new grade 6-12 public school will be modeled on other dual-language city schools and have no religious component.

But the shirt sales are giving new ammunition to critics who fear Almontaser's school will teach a biased view of Middle Eastern history.

"Intifada is a war. Isn't that what Arafat had?" said Pamela Hall, a Manhattan mom opposed to the academy on the grounds that it violates separation of church and state.

A Department of Education spokeswoman defended Almontaser, saying her link to the T-shirt was tenuous.

RELATED LINKS
• IRAQ GI SALUTES ARAB SCHOOL BY DAVID ANDREATTA ...
• ARAB SCHOOL FINDS A HOME BY DAVID ANDREATTA TATIANA DELIGIANNAKIS ...

MOST EMAILED
• SAD WEIGH TO GO
• PRINCIPAL TRAINING 'LEADS' NOWHERE
• OUT 'STEALING'
• MORE



THANKSGIVING
MATTRESS SALE
learn more

SLEEPY'S The Mattress Professionals

ALL CLASSIFIEDS

DATING   JOBS   AUTOS   REAL ESTATE

New Cars                    Used Cars
Select a Year ▼             Select a Make ▼
Select a Make ▼             Select a Model ▼
Select a Model ▼
                            SUBMIT
SUBMIT

Exhibit E



-----Original Message-----
From: Meyer Melody <MMeyer@schools.nyc.gov>
To: Almontaser Debbie (15K592) <DAlmont@schools.nyc.gov>; njdsa719@aol.com
Sent: Mon, 6 Aug 2007 1:46 pm
Subject: Letter from Dov Hikind calling for Almontaser firing

Hi Debbie,

Just want to keep you in the loop. So far, we've received a follow up call from the Post with reference to the letter below. We've also gotten a call from the Sun, WCBS radio, and CNN American Morning. David suggests that you solicit some of your former colleagues -- particularly those from the Jewish Community -- to write letters to the editor of the Post, defending you. Something saying that the Post article implies that Debbie Almontaser condones violence, when her entire career has been about finding ways to resolve conflict without violence. Particularly poignant if this comes from prominent figures in the Jewish community who know this to be true about you.

Melody

Exhibit F



-----Original Message-----
From: Cantor David <DCantor@schools.nyc.gov>
To: njdsa719@aol.com; Meyer Melody <MMeyer@schools.nyc.gov>
Sent: Mon, 6 Aug 2007 1:38 pm
Subject: Re: Khalil

I specifically said that debbie shd not defend or try to explain message of
t-shirts--precisely bc I wanted to avoid this kind of coverage. Why did this
happen?
------Original Message------
From: njdsa719@aol.com
To: Melody Meyer
To: Cantor David
Sent: Aug 5, 2007 4:12 PM
Subject: Re: Khalil

Hey Melody and David,

What a way to spend a Sunday... Please find my responses below to these nutty
questions.

Thanks,

Deb

Exhibit G





# Khalil Gibran International Academy
## 15K592
345 Dean Street
Brooklyn, NY 11217
### Debbie Almontaser - Principal

August 10, 2007

Dear Chancellor Klein,

I am writing to inform you of my decision to resign as the Principal of the Khalil Gibran International Academy.

When we first spoke about an Arabic dual-language high school several years ago, I was deeply impressed with your leadership in seizing this historic opportunity. Your passion for rolling back disparities and your commitment to pursuing equity in education as today's most pressing civil rights issue is truly inspirational. I was so honored when you chose me to lead this effort. When the Deputy Mayor and Mayor affirmed their commitment to this historic Academy, I knew that the dream of many New Yorkers would soon be a reality.

The days that I have spent establishing the Academy have been some of the best of my life – I have never seen as talented a group of teachers and other staff as we assembled to lead this school. The vision of the many parents who dreamed of this Academy and fought for its creation is now a reality. Their sons and daughters will now have access to a first rate education in the finest tradition of the Department of Education.

As you know, I have spent the past two decades of my life building bridges among people of all faiths – particularly among Muslims and Jews. The community of tolerance, understanding and respect for people of different backgrounds is alive and well in New York City.

Unfortunately, a small group of highly misguided individuals has launched a relentless attack on me because of my religion. They have used my religion as the pretext to undermine the Academy and have taken my words out of context to distort my record and portray me as something that I am not. They have not succeeded, of course. The Academy will open as scheduled. They confused me for the larger movement in support of equity in education for all New Yorkers and they underestimated the Mayor's commitment.

With your unwavering support in the face of these unprecedented attacks, and the love of my family, they did not bother me. However, their intolerant and hateful tone has come to frighten some of the parents and incoming students. I have grown increasingly concerned that these few outsiders will disrupt the community of learning when the Academy opens its doors on September 4th.

Therefore, I have decided to step aside to give the Academy and its dedicated staff the full opportunity to flourish without these unwarranted attacks.

The small group of fear mongers who used hate and prejudice to try to derail the Academy are on the wrong side of history. New York is bigger than that; America is fairer than that.

Sincerely,

Debbie Almontaser

Principal Khalil Gibran International Academy

cc: Garth Harries        Dennis Walcott

Exhibit H

**The New York Times**
nytimes.com



PRINTER-FRIENDLY FORMAT
SPONSORED BY

October 18, 2007

NEW YORK

# Manhattan: Principal Won't Be Rehired

By JENNIFER MEDINA

City school officials said yesterday that they would not consider reappointing the founding principal of the city's first Arabic-language school. The former principal, Debbie Almontaser, said on Tuesday that the Bloomberg administration forced her to resign in August by threatening to close the school if she did not. Ms. Almontaser, who resigned after defending the use of the word "intifada" on a T-shirt, said that she had been the victim of a right-wing smear campaign and was applying to get her job back. Education officials had initially said her application would be considered. But David Cantor, a spokesman for Schools Chancellor Joel I. Klein, said yesterday that it was clear Ms. Almontaser, who remains an employee of the Education Department, would not be placed as principal at the school. He said 25 people had submitted applications, which were due Tuesday.

Copyright 2007 The New York Times Company