UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

DEBBIE ALMONTASER,

                              Plaintiff,

          -against-                                        **CV07-**

                                                          ECFCASE
NEW YORK CITY DEPARTMENT OF EDUCATION;
JOEL KLEIN, individually and in his official capacity as          *07 CIV 10444 (SHS)(FM)*
Chancellor of the New York City Department of Education;
ROSEMARY STUART, individually and in her official
capacity as Community Superintendent of District 15 and
Hiring Manager; CITY OF NEW YORK; MICHAEL
BLOOMBERG, individually and in his official capacity as
Mayor of the City of New York; DENNIS WALCOTT,
individually and in his official capacity as Deputy Mayor
for Education and Community Development,

                              Defendants.
-----------------------------------------------------------------------x


### MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
### PRELIMINARY INJUNCTIVE RELIEF

                    ALAN LEVINE (AL 5297)
                    99 Hudson Street- 14th Floor
                    New York, New York 10013
                    (212) 739-7506


                    BELDOCK LEVINE & HOFFMAN LLP
                    Cynthia Rollings (CR 6469)
                    Clare R. Norins (CN 2821)
                    99 Park Avenue - Suite 1600
                    New York, New York 10016
                    (212) 490-0400

# TABLE **OF** CONTENTS

Page(s)

Table of Authorities ................................................................ ii

Introduction ...................................................................... 1

Statement Of Facts ............................................................... 1

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Plaintiff Is Entitled To Preliminary Injunctive Relief ............................... 2

Point I. ......................................................................... 3

Plaintiff Will Suffer Irreparable Harm Absent
Injunctive Relief. ........................................................... , . 3

Point II .......................................................................... 4

Plaintiff Has Established A Likelihood Of Success On
The Merits of her First Amendment Claim ....................................... 4

    Plaintiff's Speech was Constitutionally Protected .............................. 6

        A. Plaintiff's Speech was on a Matter of
           Public Concern ..................................................... 6

        B. Plaintiff's Speech was not *Garcetti*
           Speech ............................................................ 7

    Plaintiff's Speech was the Motivating Factor in the Refusal
    to Consider Her Application ................................................ 8

    DOE's Burden to Show Disruption .......................................... 9

Point III. ........................................................................ 15

Plaintiff Is Entitled To Expedited Discovery ...................................... 15

Conclusion ...................................................................... 16

# TABLE OF AUTHORITIES

CASES                                                                    Page(s)

Abdul Wali v. Coughlin,
754 F.2d 1015 (2d Cir. 1985)                                                   3

Ayyash v. Bank Al-Madina,
233 F.R.D. 325 (S.D.N.Y. 2005)                                             15, 16

Bauer v. Sampson,
261 F.3d 775 (9th Cir. 2001)                                                  11

Berger v. Battaglia,
779 F.2d 992 (1985)                                                          11

Bernheim v. Litt,
79 F.3d 318 (2d Cir. 1996)                                                   4,7

Bery v. City of New York,
97 F.Jd 689 (2d Cir. 1996),
cert. denied,
520 U.S. 1251 (1997)                                                         .4

Bieluch v. Sullivan,
999 F.2d 66 (2d Cir. 1993)                                                     6

Catletti ex reI Catletti v. Rampe,
334 F.3d 225 (2d Cir. 2003)                                                 6, 7

Cohen v. California,
403 U.S. 15 (1971)                                                           12

Connecticut Dept. of Environmental Protection v. a.S.H.A,
356 F.3d 226 (2d Cir 2004)                                                    4

Connick v. Myers,
461 U.S. 138, 103 S. Ct. 1684 (1983)                                       5,6,7

Deeper Life Christian Fellowship, Inc. v. Board of Educ.,
852 F.2d 676 (2d Cir.1988)                                                    4


Elrod v. Burns,

427 U.S. 347,96 S. Ct. 2673 (1976)                                        3,4

Feiner v. New York,
340 U.S. 315 (1951)                                                        .12

Frank v. Relin,
1 F.3d 1317 (2d Cir. 1993)                                                5

Garcetti v. Ceballos,
126 S. Ct. 1951 (2006)                                                    7

Gorman-Bakos v. Cornell Co-op Extension of Schenectady County,
252 F.3d 545 (2d Cir. 2001)                                               5,8

James v. Board of Education,
461 F.2d 566 (2d Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Jeffries v. Harleston, (Jeffries I)
21 F.3d 1238 (2d Cir. 1994),
cert. granted & judgment vacated,
513 U.S. 996, 115 S. Ct. 502 (1994),
on remand, (Jeffries II)
52 F.3d 9 (2d Cir. 1995)                                                  passim

Jolly v. Coughlin,
76 F.3d 468 (2d Cir.1996)                                                 .4

Johnson v. Ganim,
342 F.3d 105 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Latino Officers Ass'n N.Y., Inc. v. CityofN.Y.,
196F.3d458 (2dCir. 1999)                                                  3

Locurto v. Guiliani,
447 F.3d 159 (2006)                                                       .10, 13, 14

Melzer v. Board of Education of City School Dist. of City of New York,
336 F.3d 185 (2d Cir. 2003)                                               9, 10, 12, 14

Morris v. Landau,
190 F.3d 102 (2d Cir. 1999)                                               5

Morris v.Town of Cortlandt,
96 F.3d 102 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Notaro v. Koch,
95 F.R.D. 403, 405 n. 4 (S.D.N.Y.1982)                                    15,16

North Atlantic Instruments, Inc. v. Haler,
188 F.3d 38 (2d Cir. 1999)                                                    3

Pickering v. Bd. of Ed.,
391 U.S. 563, 88 S. Ct. 1731 (1968)                                           5

Reuland v. Hynes,
460 F.3d 409 (2d  Cir. 2006)                                                   6

Salge v. Edna Independent School Dist.,
411 F.3d 178 (5th Cir. 2005)                                                 11

Sassi v. Lou-Gould,
2007 WL 635579 (S.D.N.Y. Feb. 27, 2007)                                       7

Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.,
No. 07-22014, 2007 WL 1121734 (S.D.N.Y. Apr. 11,2007)                        16

TCPIP Holding Co., Inc. v. Haar Communications, Inc.,
244 F.3d 88 (2d Cir. 2001)                                                    3

Texas v. Johnson,
491 U.S. 397 (1989)                                                          12

Waters v. Churchill,
511 U.S. 661, 114S.Ct.1878(1994)                                              9

RULES AND REGULATIONS

Fed. R. Civ. P. 26(d)                                                        .16

Advisory Committee Notes to 1993 Amendments to Subdivision (d)               .16

INTRODUCTION

Plaintiff submits this memorandum of law in support of her application for a temporary restraining order and preliminary injunction.  Plaintiff, the founding principal of the Khalil Gibran International Academy, was forced to resign from that position following her comments on a matter of public concern.  She has now applied for a permanent principal's position at KGIA and alleges that, in violation of her First Amendment rights, her application has been denied full and fair consideration.  She seeks a preliminary injunction requiring that her application be given such consideration.  She also seeks a TRO prohibiting the appointment of a principal until her application is fairly and impartially considered.

STATEMENT OF FACTS

This Memorandum of Law is submitted in support of plaintiffs application for preliminary injunctive relief.  The facts are set forth fully in the Complaint in this action and in plaintiffs moving affidavits.

The basis of plaintiffs claim is that she has been denied the opportunity to interview for the position of principal of the KGIA, and therefore effectively denied the KGIA principal position, because of her words reported in the New York Post.  It is plaintiffs claim that in retaliation for her protected speech providing the historical meaning of the word "intifada", defendants forced her to resign as acting principal of KGIA and are now denying her the opportunity to receive fair and unbiased consideration for the permanent principal position, in violation of the First Amendment and applicable Chancellor's Regulation.  Plaintiff requests injunctive relief from this Court to address not only the imminent and irreparable harm to plaintiff, but to redress the chilling effect such open and unfettered retaliation will have upon

other educators in the public school system of the City of New York.

These are Almontaser's published words reported by the <u>Post</u> reporter:

"The word [intifada] basically means 'shaking off.' That is the root word if you look it up in Arabic," she said.

"I understand it is developing a negative connotation due to the uprising in the Palestinian-Israeli areas. I don't believe the intention is to have any of that kind of [violence] in New York City.

"I think it's pretty much an opportunity for girls to express that they are part of New York City society ... and shaking off oppression."

Plaintiff's words are clearly protected speech on a matter of public concern protected by a long body of established First Amendment law. Yet, not only has she been forced to resign, but now her application for the permanent position of principal at KGIA has been denied full and fair consideration three months later. It is clear from statements of a DOE employee to plaintiff and from a DOE press spokesman to the <u>New York Times,</u> and a conversation between plaintiff's counsel and the DOE General Counsel, that the DOE will not consider plaintiff for the position because she is considered a "lightning rod." In short, she is being denied a position because her statement on a matter of public concern generated some amount of controversy. It is difficult to imagine a plainer violation of the First Amendment.

<u>ARGUMENT</u>

<u>PLAINTIFF IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF</u>

The party seeking the injunction must show (a) irreparable harm and (b) either (1) likelihood of ultimate success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly

toward the party seeking relief.  See TCPIP Holding Co., Inc. v. Haar Communications, Inc., 244

F.3d 88,92 (2d Cir. 2001); North Atlantic Instruments, Inc. v. Haler, 188 F.3d 38,43 (2d Cir.

1999).

POINT I

PLAINTIFF WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

The applicable standard for granting injunctive relief is met here.  Defendants'

constructive discharge of Almontaser as acting principal of KGIA because of her statements to

the New York Post reporter, and defendants' subsequent refusal to consider Almontaser for the

position of permanent principal of KGIA, constitute retaliation against Almontaser for the

exercise of her First Amendment rights.  It will also inevitably chill the First Amendment

freedom of other Department of Education employees, currently and in the future, to speak on

political matters of public concern.

The deprivation of constitutional rights has been held in and of itself to constitute an

irreparable injury.  See, e.g., Elrod v. Burns, 427 U.S. 347,96 S. Ct. 2673 (1976) (the loss of

First Amendment rights for even a minimal amount of time constitutes an irreparable injury);

Abdul Wali v. Coughlin, 754 F.2d 1015 (2d Cir. 1985) (interference by prison officials with the

delivery to inmates of a report critical of a state prison was a deprivation of the inmates' First

Amendment rights and an irreparable injury).  The First Amendment violation arising from

Almontaser's discharge and defendants' refusal to consider her for the position of principal

constitutes irreparable harm sufficient to warrant injunctive relief.  See Latino Officers Ass'n

N.Y., Inc. v. City of N.Y., 196 F Jd 458,462 (2d Cir. 1999) (violations of First Amendment

rights are "commonly considered irreparable injuries for the purposes of a preliminary

injunction")   (quoting <u>Bery</u> v. <u>City</u> of <u>New</u> <u>York</u>, 97 F.3d 689,693 (2d Cir. 1996), <u>cert.</u> <u>denied</u>, 520 U.S. 1251 (1997)); <u>Deeper</u> <u>Life</u> <u>Christian</u> <u>Fellowship</u>, <u>Inc.</u> v. <u>Board</u> of <u>Educ.</u>, 852 F.2d 676, 679 (2d Cir.1988).

In addition to Almontaser's suffering a deprivation of her constitutional rights, which the courts view as <u>per</u> <u>se</u> irreparable harm[1], KGIA is the only public Arab-language academy in New York City. It is therefore unique. Almontaser directed and supervised every stage of KGIA's creation and development until her forced resignation shortly before it opened its doors on September 4,2007. She is therefore uniquely qualified to lead KGIA. For Almontaser, there is simply no other position in the New York City schools that is comparable to the principalship of KGIA. Accordingly, there is no adequate remedy at law. See, <u>e.g.</u>, <u>Jeffries</u> v. <u>Harleston</u>, 21 F.3d 1238, 1249 (2d Cir. <u>1994)(Jeffries</u> <u>I)</u>.   While all of the foregoing tip the balance of hardships toward plaintiff and injunctive relief, the likelihood of ultimate success on the merits of plaintiff's federal constitutional claim is also clear.

POINT II

<u>PLAINTIFF</u> <u>HAS</u> <u>ESTABLISHED</u> <u>A</u> <u>LIKELIHOOD</u> <u>OF</u> <u>SUCCESS</u> <u>ON</u> <u>THE</u> <u>MERITS</u> <u>OF</u>
<u>HER</u> <u>FIRST</u> <u>AMENDMENT</u> <u>CLAIM</u>

A public employee's speech on a matter of public concern is entitled to protection, as stated by the Second Circuit in <u>Bernheim</u> v. <u>Litt</u>, 79 F.3d 318 (2d Cir. 1996):

> "[W]hen a public employee speaks as a citizen on a matter of public concern, that speech is entitled to First Amendment protection."

---

[1]"[W]e have held that the alleged violation of a constitutional right triggers a finding of irreparable injury. <u>Jolly</u> v. <u>Coughlin</u>, 76 F.3d 468, 482 (2d Cir.1996). Because violations of constitutional rights are presumed irreparable, <u>Elrod</u>[, 427 U.S. at 373], 'the very nature of [the plaintiffs] allegations' satisfies the requirement that it show irreparable injury.Bery], 97 F.3d at 694]." <u>Connecticut</u> <u>Dept.</u> <u>of</u> <u>Environmental</u> <u>Protection</u> v. <u>a.S.B.A.</u>, 356 F.3d 226, 231 (2d Cir. 2004).

4

79 F.3d at 324 (citing Mt. Healthy City Sch. District Bd. of Edu. v. Doyle, 429 U.S. 274,97 S. Ct. 568 (1977).

A public employer cannot discharge or retaliate against, or refuse to hire, an employee for the exercise of his First Amendment right to speak out on matters of public concern,. See, e.g., Connick v. Myers, 461 U.S. 138,103 S. Ct. 1684 (1983); Pickering v. Bd. of Ed., 391 U.S. 563, 88 S. Ct. 1731 (1968);Morris v.Town of Cortlandt, 196 F.3d 102, **110** (2d Cir. 1999)(HAdverse employment actions include ... refusal to hire").

When an issue arises relating to the First Amendment rights of a public employee, a court must "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. 568, 88 S. Ct. 1731. A public employee claiming to have been discharged or disciplined for the exercise of his First Amendment rights must establish first that the speech at issue can be "fairly characterized as constituting speech on a matter of public concern." Connick, 461 U.S. at 146. Second, the employee must establish that the speech was at least a substantial or motivating factor in the discharge. See Gorman-Bakos v. Cornell Co-op Extension of Schenectady County, 252 F.3d 545,553 (2d Cir. 2001); Morris v. Landau, 190 F.3d 102 (2d Cir. 1999).

The public employer may prevail if it can show that the employee's conduct "interfered with [the employer's] 'effective and efficient fulfillment of its responsibilities to the public'" (Frank v. Relin, 1 F.3d 1317, 1329 (2d Cir. 1993) (quoting Connick, 461 U.S. at 148 n.7). The government can meet that burden making "a substantial showing of likely interference and not an actual disruption." Jeffries v. Harleston, 21 F.3d 1238 (2d Cir. 1994), cert. granted & judgment

vacated 513 U.S. 996,115 S. Ct. 502 (1994), on remand, 52 F.3d 9,13 (2d Cir. 1995). To prevail, the government must show that "(1) the employer's prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for the speech." Jeffries II, 52 F.3d at 13.

Plaintiffs Speech was Constitutionally Protected

A. Plaintiffs Speech was on a Matter of Public Concern

The first issue in the inquiry is whether plaintiffs speech is "fairly characterized as speech on a matter of public concern." Speech can be so characterized when it "relat[es] to any matter of political, social, or other concern to the community." Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003) (quoting Connick, 461 U.S. at 146) (letter raising concerns about possible corruption addressed public concerns). Whether speech is on a matter of public concern is a question of law, to be determined on the basis of "the content, form, and context of a given statement, as revealed by the whole record." rd. at 112 (citing Connick, 461 U.S. at 147-48).

Plaintiffs speech relating to the historical meaning of the word intifada clearly qualifies as speech on a matter of public concern. Courts have consistently found that speech [on similar matters] is matters of public concern. See, e.g., See Reuland v. Hynes, 460 F.3d 409, 415 (2d Cir. 2006) (speech will be determined to be of public concern if it "relates to any matter of political, social, or other concern to the community."). Whether speech relates to a matter of public concern is "determined by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 (1983). Bieluch v. Sullivan, 999 F.2d 66 (2d Cir. 1993) (speech made in course of political community activities); Catletti ex

reI Catletti v. Rampe, 334 F.3d 225, 230 (2d Cir. 2003) (mental health services at county prison issue of public concern).    Nor does the speech at issue relate to conditions of employment or matters of personal concern.  See, e.g., Connick, 461 U.S. at 147; Bernheim, 79 F.3d at 324-25 (distinguishing between statements on matters of personal interest and those relating to "issues of serious interest to the community" about which employees "should be able to speak freely . . . without fear of retaliation").

B.  Plaintiff's Speech was not *Garcetti* Speech

In Garcetti v. Ceballos, 126 S. Ct. 1951, 1960-61 (2006), the Supreme Court held that the First Amendment does not protect speech made by public employees "pursuant to their official duties".  The speech at issue in Garcetti was a internal memorandum prepared by Ceballos, a deputy district attorney, for his supervisors which outlined Ceballos' concerns about a pending criminal case and recommended dismissal of the case.  Ceballos claimed he was subjected to subsequent retaliatory employment action.  The Court found- and the parties did not dispute- that Ceballos' "expressions were pursuant to his duties as a calendar deputy".  The Court held that when public employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes and the Constitution does not protect their communications.  Id.    Following Garcetti, in order to be protected by the First Amendment, speech must be made in the capacity of a citizen speaking on a matter of public concern, as opposed to speech pursuant to official duties.  See, e.g, Sassi v. Lou-Gould, 2007 WL 635579, at *3 (S.D.N.Y. Feb. 27, 2007) (speech protected where Chief of Police wrote letters to City Council specifically stating that he was writing in his capacity as a "resident taxpayer" and complaining about police department funding and moral; court reasoned that, unlike the Garcetti

plaintiff, whose job it was to write the memo which he claimed constituted protected speech, Chief Sassi had no such duty to write public letters to the City Council and was therefore speaking as a citizen, rather than as a public employee).  Almontaser's words to the <u>Post</u> reporter were public words spoken in her capacity as a private citizen speaking on a matter of public concern, as opposed to pursuant to her official job duties.  Almontaser's speech is protected under <u>Garcetti</u> even if she was encouraged by the DOE to speak.  The inquiries from the <u>Post</u> to which she responded were about her personally and not about her duties at KGIA.

<u>Plaintiffs Speech was the Motivating Factor in the Refusal to Consider Her Application.</u>

The next issue in the inquiry is whether the speech was a substantial or motivating factor in the employment decision.  Separate and apart from Almontaser's stellar qualifications and unique fitness for the position, her involvement in the creation of KGIA, her appointment and service as acting principal, and documentary and anecdotal evidence of defendants' motivation, the timing of events as detailed in the complaint and supporting affidavits demonstrates that plaintiffs protected speech on a matter of public controversy was the motivating factor in defendants' actions, first in forcing her resignation, and then by refusing to consider her application for the permanent principal position.  There is no other explanation for these actions.  Aside from the telling sequence of events, <u>see</u> <u>Gorman-Bakos,</u> 252 F.3d at 554-55 (temporal proximity supports conclusion that retaliatory acts relate to plaintiffs speech), there are the comments by the DOE employee to plaintiff that the Community Superintendent's "boss" would not permit her to become KGIA principal, the statement in the <u>New York Times</u> from the Chancellor's spokesman that she would not be "placed as principal of the school," and the statement by DOE General Counsel that plaintiff was a "lightning rod" who would not be placed

in KGIA or any school likely.to attract attention.

DOE's Burden to Show Disruption

The third prong of the inquiry is the balance between the speech and any concern on the part of the employer as to potential disruption to efficiency of operations.

Here, Almontaser's comments to the Post concerning the root meaning of the word "intifada" relate to quintessential issues of public concern such as global conflicts and the political use of language. As such, the DOE must make a substantial showing that Almontaser's remarks to the Post were likely to be disruptive. See Waters v. Churchill, 511 U.S. 661, 674 (1994) (where a government employee has "a strong, legitimate interest in speaking out on public matters" the government "may have to make a substantial showing that the speech is, in fact, likely to be disruptive"). Specifically, the DOE must make a substantial showing that Almontaser's statements were likely to "impair[ ] discipline by superiors or harmony among co-workers, ha[ve] a detrimental impact on close working relationships ... or impede[ ] the performance of the [plaintiffs] duties or interfere[ ] with the regular operation of the enterprise.'" Melzer v. Board of Education of City School Dist. of City of New York, 336 F.3d 185, 197 (2d Cir. 2003) (quoting Rankin v. McPherson, 483 U.S. 378, 388 (1987)).

It is beyond dispute that there was no actual disruption to the operation of the school because the school had not opened and was not scheduled to open for several weeks. Thus, defendants must rely on likely disruption to justify their treatment of plaintiff.

As the Second Circuit stated in Jeffries II: "the closer the employee's speech reflects on matters of public concern, the greater must be the employer's showing that the speech is likely to be disruptive before it may be punished." Jeffries, 52 F.3d at 12 (citing Waters, and U.S. v.

Treasury Employees Union, 513 U.S. 454 n.21, 115 S. Ct. 1003 (l995)("when government employees speak or write on their own time on topics unrelated to their employment, the speech can have First Amendment protection, absent some governmental justification "far stronger than mere speculation ... ,,2)(quoted with approval in Locurto v. Guiliani, 447 F.3d at 174)).  While a showing of probable future disruption may satisfy the balancing test, such a prediction must be reasonable.  Melzer v. Board of Education, 336, F.3d 185, 197 (2d Cir. 2003).  And see James v. Board of Education, 461 F.2d 566, 572 (2d Cir. 1972) ("[F]reedom of expression demands breathing room.  To preserve the 'marketplace of ideas' so essential to our system of democracy, we must be willing to assume the risk of argument and lawful disagreement. [Citations omitted.] This is entirely different however, from saying that the school must await open rebellion, violence or extensive disruption before it acts.")

There was nothing like that here.  The most that defendants may claim is that plaintiff became a "lightening rod" because of her comments in the Post.  To the extent petitioner received negative publicity, however, it was not the words themselves which became the issue so much as the "spin" put on the words by the Post reporter and others in the next couple of days. The article was captioned "City Principal is 'Revolting:", an accompanying picture is captioned "Furor: The pro-violence shirt (above) is being defended by Principal Debbie Almontaser" and the article states: "Almontaser downplayed the significance of the T-shirts."  Yet that is simply not what she said; it is what the Post said she said.

_____

2  To the extent the negative reaction was based on anti-Arab/anti-Muslim bias, "Private biases may be outside the reach of the law, but the law cannot directly or indirectly give them effect." Public officials sworn to uphold the Constitution may not avoid a constitutional duty by bowing o the hypothetical effects of private racial prejudice that they assume to be both widely and deeply held. [citation omitted]
Palmore v. Sidoti, 466 U.S. 429, 433 (1984).

**In** any event, it was KGIA itself which was the "lightening rod" from day one. There was a segment of the community which was adamantly opposed to the Arab culture/dual language school long before the t-shirts appeared on the scene. Plaintiffs comments to the Post accompanied by a Post archival photograph of plaintiff in a head scarf served only to shift the focus of the opposition to plaintiff in the days immediately following the article. Not only was this nothing new; it was limited, not effectively rebutted by the DOE and not given a chance to abate with the passage of time. See, e.g., Salge v. Edna Independent School Dist., 411 F.3d 178, 195-6 (5th Cir. 2005)(secretary's remarks to reporter, which served as the basis for one of many newspaper articles, "made against a background of existing community debate"; school district failed to show that secretary's speech was likely to cause any disruption, in part, because members of the community had already expressed concern regarding issues before publication of the article). And see, e.g., Bauer v. Sampson, 261 F.3d 775 (9th Cir. 2001) (where college chancellor sought to discipline professor for writings critical of college's acting president, court noted "it can hardly be said that [plaintiff] was the source of the disharmony on IVC's campus. IVC and the District were going through a contentious period --[plaintiff]'s commentary on these troubles may have raised awareness, but the expression certainly did not cause them."). DOE will be hard pressed to show a likelihood of disruption stemming from Almontaser's speech as opposed to the pre-existing controversy.

**In** any event, defendants' suggestion that plaintiff can be barred from a position at KGIA because she is a "lightning rod" is little more than a different articulation of the concept of a "heckler's veto", the rejection of which is a fundamental principle of First Amendment jurisprudence. As described by the Fourth Circuit in Berger v. Battaglia, 779 F.2d 992 (1985):

> Historically, one of the most persistent and insidious threats to first amendment rights has been that posed by the "heckler's veto," imposed by the successful importuning of

11

government to curtail "offensive" speech at peril of suffering disruptions of public order. See Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). Government's instinctive and understandable impulse to buy its peace--to avoid all risks of public disorder by chilling speech assertedly or demonstrably offensive to some elements of the public--is a recurring theme in first amendment litigation. See, e.g., Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714,41 L.Ed.2d 770 (1974); [citations omitted] Though this "veto" has probably been most frequently exercised through legislation responsive to majority sensibilities, the same assault on first amendment values of course occurs when, as here, it is exercised by executive action responsive to the sensibilities of a minority.

The "heckler's veto" principle applies even when there is real community outrage, as there was not here. See Feiner v. New York, 340 U.S. 315, 320 (1951)("[T]he ordinary murmurings and objections of a hostile audience cannot be allowed to silence a speaker."); Cohen v. California, 403 U.S. 15,20 (1971)( "The argument amounts to little more than the self-defeating proposition that to avoid physical censorship of one who has not sought to provoke such a response by a hypothetical coterie of the violent and lawless, the States may more appropriately effectuate that censorship themselves.") And see Texas v. Johnson, 491 U.S. 397, 408-09 (1989)(flag burning case).

The "heckler's veto" was addressed in this Circuit in the employment context in Melzer v. Board of Education, 336 F3d 185, 199 (2d Cir 2003). Melzer was a teacher at Bronx Science who was fired after it became public that he was a member of the North American Man/Boy Love Association ("NAMBLA"). The district court found that Melzer's First Amendment expression created a substantial likelihood of disruption to the operation of the school, attaching "particular significance to the concerns of the student body, as articulated at its meetings, that students would not be able to concentrate in a classroom taught by a teacher who they knew

advocated sex between men and boys, nor comfortably interact with the teacher, and the likelihood that students would refuse to attend Melzer's classes." Melzer v. Board of Educ. of City School Dist. of City of New York, 196 F.Supp.2d 229,251 (E.D.N.Y. 2002). In affirming, the Second Circuit acknowledged "the truism that community reaction cannot dictate whether an employee's constitutional rights are protected....We also recognize that allowing the public, with the government's help, to shout down unpopular ideas may stir anger is generally not permitted under our jurisprudence." The court also noted, however, that "[m]any of the 50 or 60 parents in attendance [at the Parents' Association meeting] expressed anger at Melzer's NAMBLA affiliation. They threatened to remove their children and conduct a sitdown strike at the school if Melzer were allowed to return." 336 F.3d 185 at 191. According to the panel in Locurto v. Ouiliani, 447 F.3d 159, 179 (2006) "[t]he Melzer panel rejected the "heckler's veto" as less applicable to the relationship between Melzer and high school parents, who were not 'outsiders seeking to heckle Melzer into silence, [but] rather...participants in public education, without whose cooperation public education as a practical matter cannot function. '" Locurto, 447 F.3d at 179, quoting Melzer, 336 F.3d at 199,

The speech and the facts are entirely different here. There was no opposition to Almontaser from KOIA parents or students, nor is there any evidence that Almontaser's comments to the Post created any disciplinary or harmony problems among KOlA staff members. The record will show that KOlA students, parents and staff were fully supportive of Almontaser, as were DOE employees to whom plaintiff spoke in the following days (and since).

This case is also easily distinguishable from Jeffries and Locurto. Lionel Jeffries was a City College professor and department chairman who made controversial derogatory public

statements about Jews.  Locurto involved police and fire department employees who participated in blackface in a Labor Day parade which included a parody of the dragging death of an African American man. Unlike the plaintiffs in <u>Locurto</u> and <u>Jeffries,</u> plaintiff was not a trouble-maker or rabble-rouser and she did not do or say anything intentionally inflammatory.  She did not seek out the <u>Post</u> but was steered to the <u>Post</u> by the DOE.   Plaintiff was a reluctant speaker who responded to an inquiry about the historical meaning of a word with political connotations, who had the continued support of KGlA's students and parents and who was a loyal and accomplished DOE employee, and who on all these grounds was entitled to the continued support of the DOE.

If any disruption to the efficient provision of public services occurred in this case, it was on the part of defendants, who have deprived KGIA of its most qualified leader, to the detriment of the innovative educational model they espouse, and chilled plaintiff's speech and that of other educators, thereby affecting the very integrity of the educational process.

Even if defendants were motivated by a reasonable concern for the potentially disruptive effects of plaintiffs speech- which was not the case here- that is not the end of the inquiry.  "A plaintiff alleging an adverse employment action in violation of the First Amendment can prevail even over an employer who took the action for legitimate reasons if the employee's expressive interests outweigh the employer's interest in preventing disruption.  <u>Locurto,</u> 447 F.3d at 183, citing <u>Jeffries</u> <u>II,</u> 52 F.3d at 13.  If "commentary on race is, beyond peradventure, within the core protections of the First Amendment" (<u>Locurto,</u> 447 F.3d at 183), there can be no question that plaintiffs comments fall within the same core First Amendment protection, outweighing DOE's concerns however they may be articulated.

14

POINT  III

<u>PLAINTIFF</u> <u>IS</u> <u>ENTITLED</u> <u>TO</u> <u>EXPEDITED</u> <u>DISCOVERY</u>

Rule 26(d) of the Federal Rules of Civil Procedure permits parties to seek leave of court

to conduct expedited discovery prior to the Rule 26(f) conference.  <u>See</u> Fed. R. Civ. P. 26(d) and

Advisory Committee Notes to 1993 Amendments to Subdivision (d).  In the past, some Courts in

this district have required a party seeking expedited discovery to satisfy a four-part test similar to

the standard for a preliminary injunction as set forth in <u>Notaro</u> <u>v.</u> <u>Koch,</u> 95 F.R.D.  403, 405 n. 4

(S.D.N.Y.1982) (the "<u>Notaro</u> test").

In recent years, however, the courts in this district have refined their thinking and have

shifted away from using the <u>Notaro</u> test in favor of a "good cause" or "reasonableness" standard,

particularly in cases where the expedited discovery is related to a motion for a preliminary

injunction.   <u>Ayyash</u> <u>v.</u> <u>Bank</u> <u>AI-Madina,</u> 233 F.R.D. 325, 326-27 (S.D.N.Y.  2005) (noting that

"many recent cases reject <u>Notaro</u> and apply a more flexible 'good cause' test") (citations

omitted).  Unlike <u>Notaro,</u> the good cause test offers flexibility because it allows a court to

consider the "the entirety of the record to date and the *reasonableness* of the request in light of

all the surrounding circumstances."  <u>Ayyash,</u> 233 F.R.D. at 326-27.

In rejecting the <u>Notaro</u> test in favor of the good cause test, recent cases have noted that

<u>Notaro</u> is not controlling law.  These courts have also focused on the incongruity of applying the

heightened <u>Notaro</u> test to motions for expedited discovery where the purpose of the discovery is

to support a preliminary injunction motion such as here:

> the <u>Notaro</u> test is similar to the analysis necessary to justify the far
> more dramatic decision to grant a preliminary injunction, and
> employing a preliminary-injunction type analysis to determine
> entitlement to expedited discovery makes little sense, *especially*

> *when applied to a request to expedite discovery in order to prepare*
> *for a preliminary injunction hearing.*

Ayyash, 233 F.R.D. at 326-27 (citation omitted) (emphasis added); Standard Inv. Chartered, Inc.
v. Nat'l Ass'n of Sec. Dealers, Inc., No. 07-22014, 2007 WL 1121734, at *5 (S.D.N.Y. Apr. 11,
2007) (stating that while the Notaro test may have been well-suited to the circumstances of that
case, it is not controlling authority).  These cases have determined that, "in deciding on a matter
merely of regulating the timing of discovery, it makes more sense to examine the reasonableness
of the request for expedited discovery in light of all the surrounding circumstances rather than
require the moving party to satisfy the standards for a preliminary injunction." Ayyash, 233
F.R.D. at 327 (quoting Merrill Lynch, Pierce, Fenner & Smith v. O'Connor, 194 F.R.D. 618,
623-24 (N.D. Ill. 2000)).

Plaintiff respectfully submits that the good cause standard set forth in Ayyash is the
proper standard for reviewing petitioner's instant request for expedited discovery.  Plaintiff can
readily make a showing of good cause because the requested discovery is narrowly tailored and
abundantly reasonable in light of the circumstances and defendants will not be prejudiced by
such discovery.  Moreover, even if the Notaro test is applied, plaintiffs application should
nonetheless be granted.

16

<u>CONCLUSION</u>

For the foregoing reasons, plaintiff requests that the Court grant her motion for preliminary injunctive relief **in** all respects, together with such other and further relief as may be just and proper.

DATED:      New York, New York
            November 19, 2007

                              Respectfully submitted,


                              _____
                              ALAN LEVINE (AL 5297)
                              99 Hudson Street- 14th Floor
                              New York, New York 10013
                              (212) 739-7506


                              BELDOCK LEVINE & HOFFMAN LLP


                              By: _____
                              Cynthia Rollings (CR 6469)
                              Clare R. Norins (CN 2821)
                              99 Park Avenue - Suite 1600
                              New York, New York 10016
                              (212) 490-0400


                              Attorneys for Plaintiff

17