Law Office of
# ALAN LEVINE

99 Hudson Street, 14th Floor                                           Tel: (212) 739-7506
New York, New York 10013                                              Fax: (212) 431-4276

December 3, 2007

**VIA FACSIMILE**
The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street, Room 1010
New York, New York 10007

Re:    *Almontaser v. NYC Department of Education, et al.*,
        07-CV-10444 (SHS) (FM)

Dear Judge Stein:

At the end of the hearing on Friday, we requested permission to submit a reply to that portion of the defendants' brief discussing *Garcetti*. In addition, the Court raised the issue of its power to issue appropriate injunctive relief. We address each of those issues below.

1.    *Garcetti v. Ceballos*

Defendants argue that, as a result of the Court's decision in Garcetti v. Ceballos, 126 S.Ct. 1951 (2006), plaintiff's speech to the New York Post on August 6, 2007 was not protected under the First Amendment. See Defs' Opp. Memo at 8-12. This argument fundamentally misinterprets the Court's holding in Garcetti: (1) the mere fact that the DOE told plaintiff to speak to the Post does not deprive her speech on a matter of public concern of constitutional protection, (2) heeding the Court's admonition that it was not establishing a rule for cases "where there is room for serious debate," id. at 1961, the case law in this jurisdiction has narrowly applied Garcetti, and (3) even if, arguendo, the Court were to find that plaintiff spoke pursuant to her official duties, her explanation of the linguistic origin of the word "intifada" falls squarely within the realm of academic freedom, which the Court specifically excepted from its application.

**Almontaser's remarks to the Post were on a matter of**
**public concern and do not lose their constitutional protection**
**merely because she was told by the DOE to speak to the Post**

Prior to the Court's decision in Garcetti v. Ceballos, it was indisputably clear that

plaintiff's speech to the Post was fully protected by the First Amendment, since it "touch[ed] upon a public concern," Ruotolo v. City of New York, 2006 WL 2033662, at *5 (S.D.N.Y. July 19, 2006) (quoting Konits v. Valley Stream Cent. High School Dist., 394 F.3d 121, 124 (2d Cir. 2005)). Defendants suggest that plaintiff's speech has lost its protection because she was told by the DOE to speak to the Post reporter. Defs' Opp. Memo at 11. In defendants' view, plaintiff's public statement on a matter of public concern is punishable because, having been told to give the interview, the statements were converted from a citizen's protected speech to an employee's unprotected speech made pursuant to her "official duties." Garcetti, 126 S.Ct. at 1960. It is, on its face, a perverse result that defendants suggest: Plaintiff is told by the DOE to speak publicly on a matter of public concern, and if the DOE does not like what she says, it can fire her.

Defendants' argument fundamentally misapprehends the Court's central concern in Garcetti, which was to avoid creating a doctrine that would potentially constitutionalize "communications between and among public employees and their superiors in the course of official business" and thereby "commit state and federal courts to a new, permanent, and intrusive role, mandating judicial oversight" of such communications. Id. at 1961. Here, however, the relevant speech was not "between and among" plaintiff and her supervisors but was plaintiff's speech to a newspaper reporter. That is speech that is at the core of First Amendment jurisprudence, and is hardly the kind of communication the Court would wish to exempt from "judicial oversight."

### Cases in this jurisdiction have narrowly applied *Garcetti*

The plaintiff in *Garcetti* did not dispute that the memorandum he submitted to his supervisors was prepared pursuant to his duties as a prosecutor. Id. at 1959-60. With this pivotal fact undisputed, the Court declared that

> we thus have no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate. We reject, however, the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions.

Id. at 1961. That is precisely the kind of overreaching defendants commit here, contending that, simply because the DOE told Ms. Almontaser to speak to the Post, her speech during the interview concerning the root meaning of the word "intifada" was pursuant to her job responsibilities. See Skehan v. Village of Mamaroneck, 465 F.3d 96, 105 (2d Cir. 2006) (noting post-Garcetti that the First Amendment generally prohibits the government "from punishing its employees in retaliation for the content of their speech on matters of public importance.").

The Second Circuit has declined to apply Garcetti in any but the most cut and dried of cases. See DeFilippo v. New York State Unified Court System, 223 Fed.Appx. 45, 46 (2d Cir. Apr. 19, 2007) (plaintiff conceded memorandum at issue was prepared pursuant to his official duties); Zelnik v. Fashion Institute of Technology, 464 F.3d 217, 225 (2d Cir. Sept. 14, 2006) ("it is uncontested that Zelnik exercised his right of speech

2

as a private citizen and not as part of his official duties"); Reuland v. Hynes, 460 F.3d 409, 415, n.5 (2d Cir. Aug. 21, 2006) (plaintiff "clearly" was not speaking pursuant to his duties as a public employee).

Defendants' argument, Defs' Opp. Memo at 9, that it was part of plaintiff's official job responsibilities to comment to the press about t-shirts that were not related to her or to KGIA is contrary to fact and is inconsistent with case law. See, e.g., Lindsey v. Orrick, 491 F.3d 892, 895-96, 898 (8th Cir. 2007) (although City employee had learned of the state's "sunshine" law during a training he had been sent to by the City and while his job required that he attend City Council meetings and make reports, "there is no evidence that [plaintiff's] job duties even arguably included sunshine law compliance," the subject on which he spoke out); Fuerst v. Clarke, 454 F.3d 770, 771-72 (7th Cir. 2006) (Posner, J.) (Garcetti inapposite where deputy sheriff passed over for promotion after he, in his capacity as union representative, criticized the county sheriff for hiring a public relations officer; "his duties as deputy sheriff did not include commenting on the sheriff's decision to hire a public relations officer"); Sassi v. Lou-Gould, 2007 WL 635579, at *3 (S.D.N.Y. Feb. 27, 2007) (where Police Chief wrote several letters to the City Council specifically stating that he was writing in his capacity as a " 'resident taxpayer' of the City of Beacon" and complaining about police department funding and morale, the court reasoned that, unlike the plaintiff in Garcetti, the Police Chief had no such duty to write public letters to the City Council 'as a resident taxpayer'); McGuire v. Warren, 490 F.Supp.2d 331, 340-41 (S.D.N.Y. 2007) (where plaintiff was contracted by the County to provide services for autistic children, her speech was protected because "it was not plaintiff's professional responsibility to challenge [the Director of Intervention Services'] views on the various methods of treatment and intervention for autistic children. . . . The fact that she was speaking on the general subject matter of her employment is inconsequential under the present circumstances.").

### Plaintiff's speech falls squarely within the realm of academic freedom

Finally, even if, arguendo, the Court were to find that plaintiff's speech to the Post was made pursuant to her official duties, her explanation of the historical meaning of a word, no matter how politically charged,[1] constitutes speech by an educator on a matter of public concern and is protected under long established notions of academic freedom. See Kunda v. Muhlenberg College, 621 F.2d, 532, 547 (3d Cir. 1980) ("academic freedom, the wellspring of education, is entitled to maximum protection"); see also Keyishian v. Board of Regents of the Univ. of N.Y., 385 U.S. 589, 603 (1967) ("The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues.").

---

[1] West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.").

The Supreme Court explicitly excepted cases involving academic freedom from the application of Garcetti, noting that "expression related to academic scholarship . . . implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence." 126 S.Ct. at 1962. Thus, even if the Court credits defendants' erroneous argument that plaintiff's job duties required her to comment on the t-shirts, Garcetti is inapplicable because all that Ms. Almontaser, an educator, did was to explain to an inquiring reporter the root meaning of the word "intifada." If academic freedom means anything, it surely means to protect speech such as this.[2]

Plaintiff has been and is being punished for having provided an academic, although unpopular, explanation of the meaning of a highly charged word. Notwithstanding the deference afforded government employers in other contexts, the Constitution simply does not permit the Department of Education to retaliate against Ms. Almontaser on this basis. See Pickering v. Board of Ed. of Township, 391 U.S. 563, 573 (1968) (rejecting the attempt of school administrators to "limi[t] teachers' opportunities to contribute to public debate"); Pico v. Board of Ed., Island Trees Union Free School Dist. No. 26, 638 F.2d 404, 432 (2d Cir. 1980) ("The plenary power of school officials transgresses First Amendment limits [ ] when their actions tend to suppress ideas."), aff'd 457 U.S. 853 (1982).

## 2.    Injunctive Relief

Assuming a finding that defendants have infringed plaintiff's constitutional rights, the Court has raised two issues concerning its power to issue appropriate injunctive relief: (1) does the Court have the power to restrain the Chancellor's and Community Superintendent's exercise of the authority vested in them by provisions of New York's Education Law absent a challenge to the constitutionality of those provisions, and (2) may the Court find irreparable harm based on the unique nature of the KGIA principal position and its unique significance to plaintiff.

(1) Section 1983 by its terms states that one who has, under color of law, caused the deprivation of the rights of another shall be liable both in "an action at law" and a "suit in equity." As a result, federal courts routinely issue injunctive relief against state actors who, acting pursuant to their authority under state law, violate a person's constitutional rights. The very purpose of 42 U.S.C. § 1983 "is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161 (1992).

We mention only a few examples with parallels to the instant case. In Ayers v. Western Line Consolidated School Dist., 691 F.2d 766 (5th Cir. 1982), the court exercised its authority under § 1983 to grant injunctive relief, notwithstanding the

---

[2] Mayor Bloomberg in his August 10, 2007 radio address recognized that plaintiff "tried to explain a word instead of just condemn." See Julie Bosman, "Under Fire, Arabic-Themed School's Principal Resigns," The New York Times, August 10, 2007.

4

statutory authority of public school district officials to make hiring and firing decisions. Specifically, it affirmed the reinstatement of a discharged teacher based upon its finding that, but for her First Amendment protected expression, her teaching contract would have been renewed. Id.at 769-70.

In Gibson v. Berryhill, 411 U.S. 564 (1973) plaintiffs sought to enjoin hearings before the Alabama Board of Optometry on charges of unprofessional conduct, claiming that the members of the Board were "biased and could not provide the plaintiffs with a fair and impartial hearing." Id. at 570. The Board was a statutory body with statutory authority to issue, suspend and revoke licenses for the practice of optometry. Id. at 567. The Supreme Court affirmed the lower court's conclusion that the Board "was so biased by prejudgment . . . that it could not constitutionally conduct hearings toward the revocation of appellees' licenses." Id. at 578.

Other examples of the many cases granting injunctive relief that restrain the defendants' statutorily conferred authority -- often in far more intrusive and expansive ways than plaintiff seeks here -- include the following; Schmelzer v. State of New York, 363 F.Supp.2d 453, 461-62 (E.D.N.Y. 2003) (injunctive relief granted against State Education Department, including appointment of a monitor and monthly reporting requirements by defendants); United States v. Yonkers Bd. of Educ., 635 F.Supp. 1577, 1577-1583 (S.D.N.Y. 1986) (ordering, inter alia, the City of Yonkers to adopt a City Council resolution setting forth a fair housing policy and establishing a Fair Housing Office to be headed by an Executive Director, ordering the City Manager to appoint as the Executive Director one of the applicants approved by both the City and the plaintiffs, imposing reporting requirements on the Fair Housing Office, ordering the City to seek HUD approval to transfer administration of its Section 8 housing program to the Yonkers Municipal Housing Authority, and enjoining the City from granting any zoning change or variance or issuing a building permit to any private developer with respect to any of the relevant public housing sites without furnishing 20-days notice to the plaintiffs), aff'd 837 F.2d 1181 (2d Cir. 1987).

While injunctive relief was granted in each of the cited cases, no claim that the statute authorizing the challenged conduct was made.

(2) There is ample authority for the conclusion that plaintiff will suffer irreparable harm if denied the opportunity to be considered by an unbiased decision maker for the KGIA principal position. Although, in employee discharge cases, irreparable harm warranting injunctive relief is not established simply by a showing of the ordinary consequences of job loss, Sampson v. Murray, 415 U.S. 61, 91-92 & n.68 (1974); see Stewart v. U.S. I.N.S., 762 F.2d 193, 199 (2d Cir. 1985), "cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found . . . [W]e do not wish to be understood as foreclosing relief in the genuinely extraordinary situation." Sampson, 415 U.S.at 92 n.68.

Such extraordinary circumstances exist here. KGIA is a one-of-a-kind school to which plaintiff has a unique and irreplaceable relationship. As plaintiff testified, KGIA,

and only KGIA, brings together the two missions upon which she has built her career: educating public school students and building bridges between New York's Arab-American communities and those of different races, culture and faiths. Over the course of two years, plaintiff built KGIA from the ground up: she participated in the discussions with New Visions that led to the formation of the school; she conducted community meetings to solicit support for the school; she assembled the design team that crafted the initial proposal to the Department of Education; she directed the development of the curriculum; she recruited and trained the teachers and staff; she recruited prospective students and their families; and, in general, oversaw every aspect of the preparations leading to the school's debelopment and its opening. KGIA was her creation and it was the culmination of her adult life's work. There is no other school like it..

Money damages are wholly inadequate to compensate plaintiff for the injury she has suffered as a result of the past and continuing retaliation against her for the exercise of her First Amendment freedoms. She has been deprived of the benefit of leading the only Arab-language, multi-cultural school in the system, a school for which she was uniquely responsible. The circumstances of her forced resignation were the subject of insulting and humiliating front page newspaper stories. Anything short of the opportunity to be fairly considered for the principal's position at KGIA will leave her irreparably harmed.

Courts recognize that under these kinds of facts, preliminary injunctive relief is warranted. See, e.g., Becton v. Thomas, 48 F.Supp.2d 747, 763 (W.D. Tenn. 1999) (irreparable harm requirement satisfied by "the unique nature of Plaintiff's former position as Chief Deputy Clerk . . .While the Probate Clerk's office has several deputy clerks, there is only one Chief Deputy Clerk."); Zervas v. District of Columbia, 1992 WL 232089, *2 (D.D.C. July 10, 1992) ("Plaintiff has also shown that he will suffer irreparable injury if the Court does not grant the requested temporary restraining order. . . [T]he A[ssistant] D[irector of] O[perations] position presents a unique career opportunity for plaintiff that is unlikely to recur in the near future."); Cohen v. Cook County, Ill., 677 F.Supp. 547 (N.D.Ill. 1988) ("Plaintiff clearly shows that without any injunction ordering preservation of the position of attending physician in pulmonary medicine he will suffer irreparable injury. Plaintiff's entire career history . . . shows he has devoted himself to practicing medicine in CCH's difficult environment, where he can service indigent patients. . . An award of monetary damages at the conclusion of a full hearing on the merits would provide a seriously deficient remedy for these intangibles."). See also Jeffries v. Harleston, 21 F.3d 1238, 1249 (2d Cir. 1994) (affirming reinstatement of Jeffries as department chair at CUNY and noting on the issue of irreparable harm "the department chair is a position of prestige, both inside and outside CUNY. Unremedied, the violation constitutes a continuing loss of that prestige, further aggravated by the cloak of disgrace that surrounded Jeffries' removal.").[3]

_____

[3] While CUNY ultimately prevailed after remand based on an intervening decision of the Supreme Court, the irreparable harm principle was undisturbed by the later decisions. See Jeffries v. Harleston, 21 F.3d 1238 (2d Cir. 1994), cert granted & judgment vacated, 513 U.S. 996 (1994), on remand, 52 F.3d 9 (2d Cir. 1995).

Respectfully submitted,

ALAN LEVINE (AL 5297)
99 Hudson Street- 14th Floor
New York, New York 10013
(212) 739-7506

BELDOCK LEVINE & HOFFMAN LLP

By

Cynthia Rollings (CR 6469)
Clare R. Norins (CN 2821)
99 Park Avenue - Suite 1600
New York, New York 10016
(212) 490-0400

*Attorneys for Plaintiff*

cc.    Paul Marks, Esq.